51130, Smith v. The Gap. Thank you, Your Honors, and may it please the Court. I represent the appellants in the above-captioned matter. The complaint plausibly alleges both that bodily qualities problems had already emerged and that defendants knew it when they spoke and that the problems with bodily quality contradicted defendants' public statements. First, the problems with bodily quality appeared almost immediately after launch. Multiple confidential witnesses confirmed this, with one noting problems within two weeks of launch and the other noting it within three to four weeks. This wasn't just isolated instances, either. These were system-wide problems, which the confidential witnesses relied on the complaint were able to show because they had issues ordering products online as well as having those products in stores. So the inventory issues caused by bodily quality had appeared well before the false statements had been made. As to the disclosure about the extent we misjudge the market for merchandise, our sales will be adversely affected. That's the one where the inventory management seems— your argument is that the body quality inventory issues had already materialized and they should have disclosed it rather than saying sort of in this hypothetical fashion. Yes, exactly. Rather than phrasing the risk in hypothetical terms, they should have— given that the inventory problems had already emerged, it was misleading to phrase it in hypothetical terms. I guess my question to that is, in the clothing retail business, isn't that always an issue? There must always be inventory management issues going on. It's like a continuous problem. So do they always have to disclose specifically what is going on? Well, what I would say is if there are actually problems with the inventory management that have already materialized that are leading to markdowns or that are leading to shortages, this court recently in the Peloton matter held that a very similar warning about inventory management was misleading. In that case, it's the city of— I'm aware of the case, and I guess that's kind of where I'm going is Peloton kind of makes one main thing, and if there's a whole backlog of those things, that's a significant problem. But the clothing industry seems like there's always different sizes that are getting inventoried and sold at discounts, and so the two seem distinguishable. What I would say to that is that, I mean, if it was certainly— if it was one item that they had access of rather than systemic problems with their general assortment of inventory. And so it wasn't just—I would agree that if they overestimate the demand for one particular— we thought there were more purple—we didn't get enough purple dresses. We didn't realize purple was in this season. That would be different from the situation when we're talking about problems that rose to the same level of what Peloton had, where you don't just have inventory in—you don't just have inventory in one or two items. It rose to the same level. That sounds like a materiality assessment. Yes, I would say—yeah, I think the thing that needs to be considered is whether these inventory problems were material inventory problems or whether they were immaterial inventory problems. And I would say, again, you know, if you're talking about one out of many items, that would be a—that would be not necessarily material. Sorry, so material—do you mean affecting sales in some material way? Is that what you mean by that? Yes, I mean that the problems are affecting inventory and sales in some material way, so— So the fact of inventory effect alone would be insufficient to trigger a disclosure or obligation without also a materialization of some kind of material or substantial effect on sales, fair to say? I think it would be fair to say that it would—it has to be some sort of material effect. That can either be in shortages leading to a decline of sales or excess of inventory leading to excessive markdowns. But the shortages or markups, would those need to be substantial in some way in order to know, for example, that it's caused by the bought equality versus other factors like supply chain issues and the like? I mean, I guess how much work does the materiality point that you've introduced do as to requiring something more than effect on inventory? Yeah, I agree that it would have to be something that an ordinary investor would want to care about. You know, it's a level of inventory issues, whether it be shortages or excess, that would be—that an ordinary investor would find relevant to their investment decision. But the materiality standard at the motion to dismiss stage is quite forgiving. You know, it's only if no reasonable investor could possibly consider this information. So what do we know for—taking the November statements first, and then we could look at the March. But for November, what does the complaint allege about what the specific impact on sales was for the clothing line, for the business writ large, as opposed to just allegations of impact on inventory? Yeah, so we know that a district manager in Northern Virginia identified stores running out of a large number of items in mid-sizes and excess inventory in plus sizes. We also know that within the first month, it was impossible to find the sizes they needed online. It was to a level where multiple confidential witnesses noticed it. And we know that—and I think the temporal proximity, I know we're going to—we're talking about both. We're talking—you know, we're starting on the November statements first, but I do think the fact that they rolled it back by—they began rolling back the program by January suggests that it is highly likely that the problems already existed by November because it doesn't seem plausible that only an issue that arose in December would lead defendants to make such a drastic step of rolling things back. The fact that they had already rolled it back by January, we would contend, makes it at least plausible, which is, you know, the standard that we're dealing with here. But, counsel, isn't December a critical month in the retail industry? In other words, wouldn't it make sense to wait until the holiday season ends to see how the sales did? Well, it's possible that they were— I mean, you're suggesting that they knew—the fact that they rolled it back in January, they knew in November. But it's possible that they were assessing it to see how they did in December, when people typically spend more and buy more clothing. Right. But then—but there were shortages in mid-sizes already identified by multiple confidential witnesses. Is shortage in the mid-size that unusual? I mean, are shortages in size? When I go to a store, if they don't have my size, they can look elsewhere. I mean, how—I'm trying to understand how that creates knowledge. Sure. On the defendants' part. Sure. That body equality was a failure in November. Sure. There are two things I would say to that. The first is that we know that there were actually shortages online, and we also know that these were serious enough shortages that it was causing problems with— you know, that it was something that would rise to the level of defendant's knowledge because it was leading to materially lower conversion rates at the stores. And the fact that, you know, shoppers weren't—like, that it was actually affecting, you know, the percentage of shoppers who actually ended up walking out buying something indicates that this wasn't just the normal case of, you know, they're not always going to have everything in the same size at the same time. So while that obviously is something that's routine, the fact that it was reducing conversion rates from the normal, that's how we know that those problems already existed out of November, were already material, and they were the sort of thing that defendants admitted they were monitoring. And so we can come to the conclusion that this was a problem by that time. Well, it was also an issue that they weren't selling the higher sizes than the extremely lower sizes, right? Yes. Those—yes, those were both issues. All right. So—and I understand that later, in hindsight, body equality was not successful, that business strategy or plan. But does it matter—there's no claim here that the poor sales were not reported. It's—the claim, as I understand it, and correct me if I'm wrong, is that you should have told us that the reason the sales were low was because body equality as a business model failed. What if it's just people don't like the clothes? Well, so I think there is some indication— I mean, if people don't like the clothes and that's linked to body equality, they would say that those statements are misleading. And I think the fact that you're seeing the excesses in those plus sizes indicates that it's not just a matter of people don't like, you know, the clothes separate apart from body equality. You cite the—and I may be mispronouncing—the Gimple case, right? Yes. But I—I'm trying to understand how that case applies here. In that case, as I understand it, there were sales benchmark. There were benchmarks for sales. And when they realized they weren't going to meet them, the defendants engaged in a scheme to advance— to basically do advanced sales to their vendors at an extremely reduced price but didn't disclose that. That didn't happen here, right? I mean, ultimately, I know they sold online at a discount price, the higher sizes. But that didn't happen here. So I'm trying to understand how the Gimple case applies to your—to this scenario. Well, I agree that it's—so we agree that that is a factual distinction. But I would say to that that we—given that they were discounting and that they were engaged in—that they were engaged in the very shortages and discount that they phrased in hypothetical terms, I think that that's what renders this case misleading, in that they were doing discounting that they phrased in hypothetical terms and that they had shortages that they also— When you say they, you mean— Defendants. In this case? In our case. That they— But I thought the online sales didn't occur until, like, March or later, until after January. Am I wrong on that? I apologize. I might have misspoke about the timing of that. But the shortages did occur already by— No, I know the shortages occurred. And I could see how this might be different if, after the Thanksgiving visit to the stores— Yes. They said, we have a problem. Let's advance sales at a reduced price, and then we'll just report that our sales are up or are as expected. But that didn't happen here. They actually did report the reduction in sales. And I'm trying to understand, does it matter whether it's because body equality failed or whether we just picked the wrong colors? We thought people were into, you know, brown and purple, and it turns out they want orange and green this season. I think it does matter that it was body equality because it was a key strategic initiative that they were touting as something that was going to be a major cause of their success. They really presented this as a very material event. So I believe that, you know, because they had put so much emphasis on it, that raises the materiality of it, you know, that the fact that they talked about it as a key strategic initiative, that it was supposed to transform the way they sold, and not just a one-off, you know, we just misjudged this quarter, and that's probably not going to have anything to do. You know, that wouldn't really reflect necessarily anything on the next quarter, if they just made a missed one quarter. But if you have this key strategic initiative that basically is wrongheaded, then you're going to have to reverse it, and that's going to be costly, and it's going to keep affecting you into the further quarters. You know, tastes change, but the size distribution of your customers. Other than Gimple, do you have a case where it's precisely where you just said, hey, they made a big deal about this new business plan, and so that raised the materiality bar? I don't know if I have any case that's specific as to that. I do want to flag, though, the fact that, you know, in terms of the question, in terms of the question of whether we sufficiently alleged that bought equality was the problem, I do want to point out that the Wall Street Journal article really did point to bought equality as being the problem. Can I ask on that point, and as it relates to the Peloton case you raised, I think you're making an argument that because the problem emerged by January, then we can sort of infer backward. There must have been clearly materialized by January to the point of making changes, both personnel and to no longer offering it. We can refer backwards to note, to the knowledge of the problem having materialized earlier and knowledge of the problem having materialized earlier. Peloton seems to cut the other way because it draws a temporal line saying, well, we have, even though there was a confidential witness who said the problem had materialized by February or whatever the date was in there, that wasn't enough to establish it at that point, even though we think there was enough information to establish it later on. So how does that sort of refer back principle work in light of Peloton drawing that distinction? Yeah. I think in our case, we do have, I think what I would point to in our case is that we have multiple confidential witnesses who are really pointing to problems as early as August and that these were leading to shortages and markdowns. Well, you've got, you've got, so this is the, I think, confidential witnesses two and four that describe size-outs occurring in stores in Northern California and Northern Virginia beginning in August. Yes. And, I mean, in contrast with other, I mean, we do have cases that sort of say one or two confidential witnesses or sporadic occurrences won't be sufficient. Peloton, you've got at least one confidential witness who is making the statement as to expressly when sort of broad-based awareness occurred, and the court in Peloton discounted that as insufficient to establish that earlier time frame. Yeah. And I think what we have here, though, is we have confidential witnesses talking about accessing the online ordering and seeing that there were size-out problems in the online ordering. And so I think that points to a systemic issue and not just isolated knowledge of what's happening at their own store. And I do want to say that, you know, it's not just that the problem clearly materialized by January. The problem had gotten so bad by January, they decided to abandon the Bata Quality Initiative. And I think, you know, it's not, I think it would be very surprising if they had been so quick to abandon it if the problems had only just emerged because of one bad holiday. I mean, so you've got launch, and then you've got termination. And somewhere along that time frame, awareness of problems emerges. Or problems emerge, and then awareness of problems emerge. And then understanding whether that's the problem versus, obviously, this is all in the context of supply chain issues during COVID, right? Right. So what do we look to in the complaint to sort of identify both? And it can't be that, you know, immediately after launch in the first instances of the problems, the problem has materialized, knowledge of problems materialized, and ascertaining of that problem as being what's affecting sales. How do we know where in that time frame that moment occurred? Or what do we look to the complaint as plausible allegations of where that moment occurs? And it can't just be that it was taken off, it was, the program was ended in January. Right. I think it's the inventory issues that were noticed at the store level that connected to online, and that those started emerging for those sellers, for the people at our confidential witnesses. I think the fact that they noticed problems online so far before the false statements, I mean, I think we're talking about August and September, they noticed these things. So the fact that they're noticing it by August and September that there were issues with getting mid-sizes online, and that they're having these excesses, I think that's a strong indication that, you know, two months later or more, by November, it would have, it creates a plausible inference that it would have risen to the level that it would have been known much more widely. And I think the, and so I think that that's sort of what can create an inference that this was a known problem, you know, well before. And I do think, you know, the COVID issue, so the COVID supply chain thing, that could explain shortages, but it can't explain excess. Because that wasn't, like, excess inventory wasn't really a problem that people had because of COVID, because the issue was it was hard to get supplies. And so the fact that you have shortages in some sizes and excesses in others suggests this isn't a COVID problem, it's something else, because with COVID, what you'd expect is to see across-the-board shortages. Thank you, Counsel. Good morning. May it please the Court. Your Honors, the allegations here don't clear the high bar for pleading securities fraud under the PSLRA and Rule 9b. What they actually show is a company that acted responsibly by taking an appropriate amount of time to understand whether a new marketing initiative was working before correcting course and issuing revised guidance in a timely way. This Court can affirm for two reasons. First, the complaint doesn't identify any actionable misstatements about the BOD Equality Program. And second, the complaint doesn't plead with particularity that material problems with the BOD Equality Program existed nationwide across all 1,200-plus Old Navy stores at the time of the challenge statements or that they were known to the defendants at that time. So starting with the statements, as the Court noted, nearly all of the statements that plaintiffs challenge are general risk disclosures under Item 105 that talk about risks that every reasonable investor understands are pervasive in the retail industry, the risk that you might misjudge consumer preferences or you might not manage your inventory correctly. As the District Court recognized, those statements are not specific enough to carry any implied representation about current operations. No reasonable investor is going to read that general warning and think, oh, GAAP is representing to me that they have not misjudged consumer preferences in the current court. Well, there is a similar disclosure in Peloton where the disclosure about the risk of excess inventory was deemed to be misleading because that had already materialized. How is that distinguished from what we say about that? Your Honor, I think Your Honor made the point earlier, Peloton's business is different. They have basically one product. I think what that points to is that as the District Court recognized, this is always a context-specific inquiry. You have to ask in the context of these disclosures, this type of business, what is a reasonable investor going to take from this risk disclosure? Now, what plaintiff's theory would do is it has no logical stopping point. It would essentially nullify the rule the Supreme Court recently reaffirmed in McQuarrie that companies have no general duty of disclosure because every material advertisement I don't know if it applies to every single kind of excess piece of clothing. I mean, the complaint is all about the body quality program and the inventory issues associated with that. So it is somewhat specific. Well, the complaint in this case is specific, Your Honor, but the theory is not limited at all. And I think my friend articulated it fairly at the podium. Their theory is that any material adverse occurrence that can be characterized as a materialization of a disclosed Item 105 risk has to be immediately disclosed. Now, the whole point of the Item 105 disclosures, they're supposed to cover the waterfront of the risks categories that the company is facing. So any material adverse event that happens during the quarter, it's going to be possible for plaintiffs to come in and say that event represented a materialization of some risk that was disclosed under Item 105. Therefore, it had to be disclosed. Now you've got exactly what the Supreme Court rejected in McQuarrie. Through the back door, you've created the general duty of disclosure that the Court has always said doesn't exist under Rule 10b. I also want to address this question of when did the problems actually reach a material level. And I think it's really important for the Court to bear in mind, Old Navy has more than 1,200 stores all around the country. Plaintiff's confidential witnesses do not have visibility into nationwide data. Let me correct that. One of them does. FE1 is the only witness who's alleged to be at the corporate level. They were the customer lead for Bata Quality. And I think they are especially notable for what they don't say. FE1 says there was nationwide data. She says there were weekly and monthly reports about inventory levels. She says nothing about the content of those reports, what they showed at any given time. She doesn't say that at a nationwide level, that material problems existed at the time of any of the challenge statements. The other former employee witnesses have insight only into two very specific markets, Northern Virginia and Northern and Central California, a handful of stores in those markets, a tiny fraction of the 1,200 stores nationwide. And even as to those stores, they don't make any effort to quantify the impact of their anecdotal observations. They say, oh, you know, we looked at the racks. We saw that it looked like there were a lot of plus sizes. We had some markdowns. They don't say how this compared to historical markdown rates. They don't say how many items or SKUs were affected. And most importantly, they don't say what was the impact on top line sales, even as to those stores, let alone as to all 1,200 plus stores nationwide. Well, former employee four does talk about the jet trip and the close eye. They were all paying attention to, with respect to inventory numbers. I think that was nationwide, wasn't it? Sure. Your Honor, I think the jet trip is actually pretty helpful to us. First of all, the jet trip is obviously after the November statement, so we'll take those off the board. The jet trip was a visit to two specific stores in Sacramento, California. And, you know, the allegation is at those stores, the managers said, we're having some inventory problems. The allegation is that there was a significant amount of discussion about this, which suggests that the executives may have been surprised by this. They didn't say, oh, yeah, we're seeing that everywhere. That's what's happening nationwide. They said, oh, really? You know, let's talk about this. The allegation is they came back the following week and sent a spreadsheet and said, we need more data. We want to understand what's happening at these particular stores in Sacramento. So I think there's nothing from that episode that supports an inference that they knew at that time that there were material problems nationwide. I guess I want to ask the inverse of my question of opposing counsel. If the program's taken down in January, that necessarily means there's data and inputs that go into that decision-making prior to the effectuation of the change, right? So, Your Honor, I have a legal response, but the most important response is a factual one, which is, you know, my friend said they decided to take the program down in January. That is not correct. That's not what's alleged in the complaint. What is alleged in the complaint is that in January, a decision was made to remove the program from 75 stores out of more than 1,200. That's roughly 5 percent of stores nationwide. The decision was to leave the program in place in the other 95 percent. So I think the fair inference from that is not that there was some kind of nationwide material problem everywhere. It's that they had to do it. Although by sometime in February and March, I don't think the complaint is specific. It goes online only. Well, that's right, Your Honor. It's not specific, and it allows for the possibility, as I think plaintiffs acknowledge in their briefs, that the decision to remove it from all stores was made at the end of March, which is after all of the challenge statements. Now, can you read that back? Your Honor pointed out Peloton doesn't support reading that back. Neither does this Court's decision in San Leandro v. Philip Morris, where there was a disclosure of a significant drop in sales, and plaintiffs wanted to assume that the company had that information just three weeks before the sale drop was disclosed, and the Court said you can't draw that inference. You have to show that they were aware of this at the time. Now, especially when you have this new program. This is a new initiative. They're trying to understand this. They're trying to get it to work nationwide. The fact that they decided to terminate the program at the end of March does not support that at the beginning of March or certainly in November that they knew at that time that there were material problems nationwide. But in the complaint, the second amended complaint, paragraph 54, alleges that in early March, February or March, extended sizing options were only available online. So they were aware at that point. Your client was aware at that point. And then the March 3 press release didn't mention body equality as having been. It acknowledged the sales were down. But at that point, are you saying there's no? Your Honor, I apologize. I'm not seeing the reference to early March. If you could point that out to me, I'd appreciate it. What I see in progress. February or March. Correct, Your Honor. February or March. So that allows it could have been the very end of March. They don't say it was early March, and they never say what would be a very easy thing for them to say if it was true that this decision had been made at the time of the challenge statements. They don't say that. They leave open the possibility. But we have to accept the allegations as true. Sure. What if it just said February, extended sizing was only available online? If it was February, then we'd have a different case. Then they'd be alleging that there was at least some information in February that supported that decision. And then we would argue about, well, have they provided enough particularity about why that decision was made, what information it was based on at that time? But that's not even this case because they haven't even alleged that the decision was made until weeks after the last of the challenge statements. I do also want to address, my friend referred to, you know, some indications this was system-wide. I think the only allegation he could be talking about is paragraph 41. And this is a very general allegation from one of the former employees who says that when certain sizes ran out, he couldn't find those depleted sizes online, he or she. This is completely unquantified as to how many sizes, how long did this last, what was the impact. And also, it doesn't suggest any inventory imbalance issue. You know, generally, the fact that the sizes were selling well elsewhere, they were selling online, well online, is a good thing. It's not a good thing if there's a glut of other sizes. But that's not alleged in that paragraph, that there was any glut of plus sizes nationwide. So I'm on my red light, but I'm happy to answer any other questions the Court has. Thank you, Counsel. Thank you, Your Honor. Thank you, Your Honor. There's just a few things I'd like to address. The first was the reference that my colleague made to McQuarrie in saying that what we were advocating is that any time an undisclosed or a risk materializes, there's a duty to immediately disclose that the risk materialized. That's not what we're saying. We are not saying they have an affirmative duty to issue an 8K. What we are saying is when you speak about those risks, those risks should not — if you were going to speak about those risks in hypothetical terms, those risks cannot have materialized when you make that statement. And I think the argument that this would overturn McQuarrie is false because we are tying the omission to identifiable statements. Let me understand that. So your allegation here is an omission. And the duty to disclose something is not created by the disclosure of the risk? I thought that was your argument. Oh, sorry. No, the argument is that the duty to disclose that the risk has materialized was created by the disclosure of the risk. But I'm not saying that if you make this — he says that — sorry, my opposing counsel stated that, you know, there's a duty to immediately disclose the risk as soon as it materializes. We're not saying that that's the case. We're saying that when you make the statement, if the risk exists at the time you make the statement, you have a duty to disclose that that risk has materialized. And that ties it to a contemporaneous statement, and that's what distinguishes this case from the concern that the Court had in McQuarrie. That creates a clear distinction. And, again, that — the idea that McQuarrie sub salientio overruled on a case is saying that you have to disclose materialized risks when you're discussing — when you're discussing risk factors, and it's misleading to disclose them as hypothetical when they've already materialized. We don't believe that McQuarrie did that, and I don't think you can take that and square that with the Peloton case. So I think that really draws the distinction there. Okay. Thank you, counsel. Thank you. Thank you both. I'll take your questions.